IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

COLORADO ENVIRONMENTAL COALITION,
WESTERN COLORADO CONGRESS,
WILDERNESS WORKSHOP,
BIODIVERSITY CONSERVATION ALLIANCE,
SOUTHERN UTAH WILDERNESS ALLIANCE,
RED ROCK FORESTS,
WESTERN RESOURCE ADVOCATES,
NATIONAL WILDLIFE FEDERATION,
CENTER FOR BIOLOGICAL DIVERSITY,
THE WILDERNESS SOCIETY,
NATURAL RESOURCES DEFENSE COUNCIL,
DEFENDERS OF WILDLIFE, and
SIERRA CLUB,

           Plaintiffs,

v.

DIRK KEMPTHORNE, in his official capacity as Secretary of the Department of Interior,
C. STEPHEN ALLRED, in his official capacity as Assistant Secretary for Land and Minerals,
Department of the Interior,
THE U.S. DEPARTMENT OF THE INTERIOR,
JAMES L. CASWELL, in his official capacity as Director of the Bureau of Land Management,
and
THE BUREAU OF LAND MANAGEMENT,

           Defendants.

_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR REVIEW OF AGENCY ACTION**
_____

**INTRODUCTION**

1.      The canyon country, mesas, and sagebrush steppe of western Colorado, eastern

Utah, and southern Wyoming contain abundant natural resources including: wilderness lands;

habitat for rare and imperiled wildlife; plentiful game such as deer, elk, and pronghorn; and

critical watersheds that provide drinking and agricultural water for millions in one of the nation's

most arid regions.  Many of these lands are owned by the American people and managed by the

United States Bureau of Land Management (BLM).

2.      Some of these lands also contain underground deposits of oil shale and tar sands,

in which hydrocarbons are locked in rock, sand, or clay.  While boosters have long proclaimed

the benefits of oil shale and tar sands as fuel sources, all efforts to develop these resource

commercially in the United States have failed.  In 2005, Congress sought to change that,

adopting provisions in the Energy Policy Act to promote oil shale and tar sands industries on

federal public lands.  Among other things, the Act required the Department of the Interior to

evaluate the environmental impacts of a commercial oil shale and tar sands leasing program on

federal lands.

3.      The 2005 law prompted concern from local communities, conservationists, the

Governors of Colorado and Wyoming, and members of Congress (including Senator Ken

Salazar), who argued that a leasing program for these resources should come only after further

research.  The stakes for the future of the West are high.  Development of domestic oil shale and

tar sands industries would destroy important habitat.  It would also require massive amounts of

electricity and water to produce.  Those demands for power and water could foul the air, worsen

global warming, and dry up streams and rivers.

4.      Despite these concerns, in November 2008 BLM amended ten land management plans in Colorado, Wyoming, and Utah to open two million acres of public land to commercial oil shale leasing, and over 430,000 acres to commercial tar sands leasing.

5.      In its haste to open these public lands to leasing, BLM ignored its own regulations granting the public an opportunity to protest the agency's decision.  BLM also ignored environmental law requiring it to study a range of alternatives to its proposed action. Specifically, the agency refused to consider protecting unspoiled wilderness lands and important wildlife habitat from commercial leasing.

6.      Because BLM's decision opening public lands to commercial oil shale and tar sands leasing violates federal law, it must be set aside and BLM enjoined from taking any action, including the sale of oil shale or tar sands commercial leases, that relies on either the decision opening lands to leasing or the inadequate environmental analysis supporting that decision.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action by virtue of the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and 28 U.S.C. § 1331 (federal question jurisdiction).

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred within this judicial district, BLM has offices in this district, public lands and resources in question are located in this district, environmental harm resulting from the Defendants' actions will impact this district, and a number of Plaintiffs reside in this district.

## PARTIES

9.      Plaintiff Colorado Environmental Coalition (CEC) is a state-based environmental advocacy organization with two field offices in western Colorado and a main office in Denver. CEC has more than 3,000 individual members and over 90 affiliated organizations.  CEC campaigns work to engage citizens in the protection of Colorado's wild places, open spaces, wildlife, and quality of life.  CEC is an active participant in public lands management in Colorado, with a demonstrated interest in energy development on Colorado's BLM lands.

10.     Plaintiff Western Colorado Congress (WCC) is a grassroots, democratic organization dedicated to challenging injustice by organizing people to increase their power over decisions that affect their lives in western Colorado.  WCC's eight community groups and 3,000 members work together to create healthy, sustainable communities, social and economic justice, environmental stewardship and a truly democratic society.  WCC has continued to be a local voice encouraging a "Go Slow" approach to oil shale development, in which impacts to communities and landscapes can be mitigated prior to their inception.

11.     Plaintiff Wilderness Workshop is a non-profit advocacy organization headquartered in Carbondale, Colorado, dedicated to conserving the natural resources and preserving the public lands of the Roaring Fork watershed, the White River National Forest, the Glenwood Springs Field Office, and adjacent public lands.  To accomplish these goals, the Wilderness Workshop engages in research, education, legal advocacy, and grassroots organizing. Wilderness Workshop not only defends pristine public lands from new threats, but also helps restore the functional wildness of landscapes fragmented by human activity.  Wilderness Workshop protects and preserves existing wilderness areas, advocates for expanding wilderness,

and safeguards the ecological integrity of all federal public lands in its area of interest.

Wilderness Workshop has a long history of participation in oil shale debates – commenting on

proposed development at every opportunity and working to inform the people of Northwest

Colorado about the impacts oil development may have.

12.     Plaintiff Biodiversity Conservation Alliance (BCA) is a non-profit conservation

group based in Laramie, Wyoming, with hundreds of members in Wyoming and other states.

The Alliance is dedicated to protecting Wyoming's wildlife and wild places, particularly on

public lands.  BCA has a long record of advocating for environmentally sound energy

development in Wyoming and throughout the West, and has been active in watchdogging oil

shale development in Wyoming and elsewhere.  BCA and its members benefit from the intact

ecosystem found in the oil shale leasing area as it exists today.

13.     Plaintiff Southern Utah Wilderness Alliance (SUWA) is a Utah non-profit

membership organization.  SUWA, based in Salt Lake City, Utah, has more than 15,000

members, many of whom reside in Utah.  SUWA's mission is the preservation of the outstanding

wilderness at the heart of the Colorado Plateau, and the management of these lands in their

natural state for the benefit of all Americans.  SUWA is a founding member of the Utah

Wilderness Coalition and promotes local and national recognition of the region's unique

character through research and public education; supports both administrative and legislative

initiatives to permanently protect Utah's wild places within the National Park and National

Wilderness Preservation System or by other protective designations where appropriate; builds

support for such initiatives on both the local and national level; and provides leadership within

the conservation movement through uncompromising advocacy for wilderness preservation.

BLM frequently solicits SUWA's input and participation in the land use planning process for a variety of resource decisions and SUWA actively participates in all levels of BLM's decision-making process.

14.     Plaintiff Red Rock Forests, based in Moab, Utah, is a non-profit organization with over 300 members, many of whom reside in Utah.  Red Rock Forests' mission is the preservation of Utah's forested and desert habitats.  Red Rock Forests relies on sound biological principles to guide its policy, goals, and decision-making, with a particular emphasis on conservation biology.  Red Rock Forests uses citizen action, community organizing, and collaborative agreements, as well as legal challenges, to further its conservation mission.  Red Rock Forests maintains a particular interest in the forested uplands and canyon country of Utah's National Forests and public lands.

15.     Plaintiff Western Resource Advocates (WRA) is a non-profit environmental law and policy organization with offices in Colorado, Utah, and Nevada, and staff in Idaho and New Mexico.  WRA's mission is to protect the West's land, air, water, and wildlife.  WRA's lawyers, scientists, and economists: 1) advance clean energy to reduce pollution and global climate change; 2) promote urban water conservation and river restoration; and 3) defend special public lands from inappropriate energy development and other threats.  WRA collaborates with conservation partners to build a sustainable future for the West.  WRA's goals include protecting habitat for threatened, endangered, and sensitive plant and animal species.  WRA has a long history of involvement on oil shale and tar sands issues.  WRA has focused its efforts on working through government and other channels to promote informed decision-making and to protect the West's land, water, people and climate.

16.     Plaintiff National Wildlife Federation (NWF) is a national non-profit organization, with forty-eight state affiliate organizations, dedicated to the protection and restoration of wildlife and wildlife habitat for this and future generations.  NWF has 1.1 million members, including over 28,000 members in Colorado, 6,000 in Utah, and 2,900 in Wyoming.

17.     Plaintiff Center for Biological Diversity (CBD) is a non-profit 501(c)(3) corporation with offices in California, Arizona, New Mexico, Oregon, Illinois, Minnesota, Nevada, Alaska, Vermont, and Washington, D.C.  CBD works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  CBD is actively involved in species and habitat protection issues worldwide, including throughout the western United States.  CBD has over 42,000 members throughout the United States and the world.

18.     Plaintiff The Wilderness Society (TWS) is a nonprofit environmental organization incorporated in the District of Columbia.  Formed in 1935, TWS has 310,000 members and supporters, including more than 6,500 members in Colorado.  The TWS Central Rockies Office addresses public lands management issues in Colorado and Utah.  TWS is devoted to preserving wilderness, forests, parks, rivers, deserts, and shorelands and is committed to fostering an American land ethic.  Its mission is to protect America's wilderness and wildlife and to develop a nationwide network of wild lands through public education, scientific analysis, and advocacy. Its goal is to ensure that future generations will enjoy the clean air and water, wildlife, beauty, and opportunities for recreation and renewal that pristine forests, rivers, deserts, and mountains provide.  TWS has long worked to enact legislation and policies that provide for the sound management of BLM lands.

19.     Plaintiff Natural Resources Defense Council (NRDC) is a national nonprofit environmental membership organization with more than 400,000 members throughout the United States and more than 14,900 members in Colorado, Utah and Wyoming.  NRDC has a long history of efforts to protect federal public lands in these three states (as well as other Western states), to require the federal government to consider environmental protection when making energy development decisions, and to support long-term solutions to America's energy problems.

20.     Plaintiff Defenders of Wildlife (Defenders) is a non-profit conservation organization dedicated to the protection and restoration of native wild animals and plants. Founded in 1947 and headquartered in Washington, D.C., Defenders currently has over one-half million members, including over 29,000 in the states of Colorado, Utah, and Wyoming. Ensuring the conservation of wildlife and habitat on federal public lands is one of Defenders' organizational priorities, and has become ever more critical in the face of global warming. Defenders is committed to helping wildlife overcome the unprecedented threat of climate change, both by reducing the greenhouse gas emissions that lead to global warming, and by helping species adapt to the climate change that is already occurring.

21.     Plaintiff Sierra Club is a national nonprofit organization of over one million members and supporters dedicated to exploring, enjoying and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  The Utah Chapter of the Sierra Club has more than 6,000 members and supporters; the Wyoming Chapter has more

7

than 1,000 members and supporters, and the Rocky Mountain Chapter (Colorado) has approximately 20,000 members and supporters.  The Sierra Club's concerns encompass the protection of wildlands, wildlife habitat, and water resources in Utah, Colorado, and Wyoming.

22.     Plaintiffs Colorado Environmental Coalition, Western Colorado Congress, Wilderness Workshop, Biodiversity Conservation Alliance, Southern Utah Wilderness Alliance, Red Rock Forests, Western Resource Advocates, National Wildlife Federation, Center For Biological Diversity, The Wilderness Society, Natural Resources Defense Council, Defenders Of Wildlife, and Sierra Club (collectively "Conservation Groups"), their employees, and their members regularly use and enjoy the public lands subject to BLM's resource management plan (RMP) amendments for recreational, scientific, spiritual, aesthetic, and other purposes.  They also derive recreational, scientific, spiritual, aesthetic, and other benefits from the public lands at issue in this case through wildlife observation, study, and photography.  Conservation Groups and their staff and members have an interest in preserving the possibility of such activities in the future.  As such, Conservation Groups, their members and staffs have an interest in advocating for the protection of these public lands and helping to ensure their continued use and enjoyment of these lands.  Each of the Conservation Groups presented comments to BLM and otherwise participated in the Oil Shale and Tar Sands RMP amendment planning process.

23.     Defendants' failure to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and implementing regulations in the adoption of the RMP amendments injures Conservation Groups and their members by denying them (and agency decisionmakers) the information that NEPA requires concerning environmental impacts and environmentally superior alternatives to the adopted RMP amendments.

24.     Defendants' failure to comply with the protest procedures established by the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., and implementing regulations injures Conservation Groups and their members by denying them the opportunity to administratively challenge BLM's decision amending ten RMPs to open over two million acres of public lands to oil shale and/or tar sands leasing and development without considering protecting sensitive areas.  Defendants' failure to comply with the protest procedures established by FLPMA and implementing regulations with respect to the RMP amendments also injures Conservation Groups and their members by removing essential procedural safeguards that help to ensure that BLM actions amending RMPs are accountable, responsive to public concerns, avoid unnecessary litigation, and that BLM's decisions are reasoned rather than arbitrary.

25.     Conservation Groups' recreational, scientific, spiritual, aesthetic, and other interests have been, are being, and, unless this Court grants the requested relief, will continue to be harmed and irreparably injured by Defendants' actions.

26.     Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the Department of the Interior.  Mr. Kempthorne is responsible for ensuring that lands administered by the Department of Interior, including BLM lands, are managed in accordance with all applicable laws and regulations.

27.     Defendant C. Stephen Allred is sued in his official capacity as Assistant Secretary for Land and Minerals, Department of the Interior.  Mr. Allred is the official who, on behalf of the Department of the Interior, approved the RMP amendments challenged here.

28.     Defendant the United States Department of the Interior (DOI) is an agency of the United States.  DOI is responsible for oversight of several agencies managing public lands, including those lands managed by BLM, and for ensuring that BLM's management is in accordance with federal law.

29.     Defendant James L. Caswell is sued in his official capacity as Director of BLM.  Mr. Caswell is responsible for ensuring that BLM lands are managed in accordance with all applicable laws and regulations.

30.     Defendant Bureau of Land Management is an agency of the United States within the Department of the Interior.  BLM is responsible for managing its lands, including the lands proposed to be opened for oil shale and tar sands commercial leasing by the decision challenged here, in accordance with federal law.

## LEGAL FRAMEWORK

### A.     The Administrative Procedure Act

31.     Because neither NEPA nor FLPMA include a citizens suit provision, this case is brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq.

32.     The APA allows persons and organizations to appeal final agency actions to the federal courts.  5 U.S.C. §§ 702, 704.  The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### B.     The Federal Land Policy and Management Act

33.     BLM manages its lands pursuant to the FLPMA, 43 U.S.C. § 1701 et seq.  Prior to FLPMA's passage in 1976, BLM lands were governed by some 3,000 outdated and often-

conflicting public lands laws, most of which were written when it was assumed that these "public domain" lands would be conveyed expeditiously to private ownership.  FLPMA cleared away many of these outmoded laws and, for the first time, provided BLM with a comprehensive, statutory statement of purposes, goals, and authority for the use and management of BLM lands.

34.     Section 202 of FLPMA, 43 U.S.C. § 1712(a), requires that BLM develop and maintain land use plans for each BLM area.  BLM's land use plans, known as RMPs, provide an orderly, public process for balancing competing demands such as commercial exploitation, recreation, and environmental protection.  43 U.S.C. § 1712.  The Secretary is required to establish, by regulation, procedures to give the public adequate opportunity to comment on and participate in the formulation of land use plans.  Id. § 1712(f); see also id. § 1740.

35.     Pursuant to FLPMA's Section 202, the Secretary of the Interior established regulations governing the development, amendment, and revision of RMPs.  See 43 C.F.R. §§ 1601.0-1 et seq.  These procedures have governed the RMP process for more than 25 years. See 48 Fed. Reg. 20,364, 20,368 (May 5, 1983) (final rule).  The Reagan Administration adopted these regulations, amending previous procedures, after an 18-month process of proposal, public comment, and evaluation of comments.  See 46 Fed. Reg. 57,448 (Nov. 23, 1981).  All parts of the regulations, including the protest procedures, were adopted to provide a "consistently applied set of regulations and procedures … which ensure participation by the public."  43 C.F.R. § 1601.0-2.  All of the regulations, including the protest procedures, were adopted "to assure meaningful public participation."  48 Fed. Reg. 20,364 (May 5, 1983).

36.     These regulations establish numerous public participation opportunities in BLM's land management planning process.  For example, regulations governing RMPs provide that

"[t]he public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments, and related guidance and be given early notice of planning activities."  43 C.F.R. § 1610.2(a).

37.    Section 1610.2(f) further provides that "[p]ublic notice and opportunity for participation in resource management plan preparation shall be appropriate to the areas and people involved and shall be provided at the following specific points in the planning process: … (4) Publication of the proposed resource management plan and final environmental impact statement which triggers the opportunity for protest (See §§ 1610.4-8 and 1610.5-1(b)) …." 43 C.F.R. § 1610.2(f) (emphasis added).

38.    Section 1610.4-8 provides that "[a]fter publication of the draft resource management plan and draft environmental impact statement, the Field Manager shall evaluate the comments … and recommend to the State Director … a proposed resource management plan and final environmental impact statement … the State Director shall publish the plan and file the related environmental impact statement."  43 C.F.R. § 1610.4-8.

39.    In furtherance of FLPMA's public participation goals, BLM's RMP regulations specifically require BLM to permit the public to file an administrative protest before the agency formally amends an RMP.  Section 1610.5-1(b) states that "[n]o earlier than 30 days after the Environmental Protection Agency publishes a notice of the filing of the final environmental impact statement in the Federal Register, and pending final action on any protest that may be filed, the State Director shall approve the plan.  Approval shall be withheld on any portion of a plan or amendment being protested until final action has been completed on such protest." 43 C.F.R. § 1610.5-1(b) (emphasis added).

40.     Section 1610.5-2 is entitled "Protest procedures."  It provides that "[a]ny person who participated in the planning process and has an interest which is or may be adversely affected by the approval or amendment of a resource management plan <u>may protest such approval or amendment</u>."  The regulations further provide that "[t]he protest shall be in writing and shall be filed with the Director.  The protest shall be filed within 30 days of the date the Environmental Protection Agency published the notice of receipt of the final environmental impact statement containing the plan or amendment in the Federal Register."  43 C.F.R. § 1610.5-2(a)(1) (emphasis added).

41.     After reviewing protests, "[t]he Director shall promptly render a decision on the protest.  The decision shall be in writing and shall set forth the reasons for the decision.  The decision shall be sent to the protesting party by certified mail, return receipt requested."  43 C.F.R. § 1610.5-2(a)(3).

42.     Finally, after responding to protests, "[t]he decision of the Director shall be the final decision of the Department of the Interior."  43 C.F.R. § 1610.5-2(b).

## C.     The National Environmental Policy Act

43.     Congress enacted NEPA to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.

44.     To fulfill this goal, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The agency should describe "any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C.

§ 4332(C)(ii).  Overall, an EIS must "provide [a] full and fair discussion of significant impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

45.     NEPA requires federal agencies, including BLM, to include within an EIS "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  The alternatives analysis is the "heart" of a NEPA document, requiring the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives" so that "reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.16.

## STATEMENT OF FACTS

**A.     Oil Shale and Its Potentially Damaging Impacts**

46.     The term "oil shale" generally refers to any sedimentary rock that contains a solid material called "kerogen" that is released as a petroleum-like liquid when the rock is heated. Theoretically, oil shale can be mined and processed to generate oil similar to that pumped from conventional wells.  However, extracting kerogen and producing oil from oil shale is much more complex and expensive than conventional oil recovery.  It requires, among other things, huge amounts of energy and water to essentially bake the rock to release the kerogen.

47.     While oil shale is found in many places worldwide, the largest deposits on earth are found in the United States in the Green River Formation of Colorado, Utah, and Wyoming. The RAND Corporation estimated in 2005 that there could be between 500 billion and 1.1 trillion barrels of oil in the Formation, although none of it is now commercially recoverable.

48.     Despite its potential, the complexity and expense of oil shale development has rendered its commercial exploitation a tantalizing prospect always just out of reach.  After a hundred years of research and promotion, commercial development of oil shale occurs nowhere in North America.  Previous attempts to exploit oil shale have caused environmental damage and social dislocation, but produced little if any marketable oil.  For example, in the late 1970s, bolstered by high oil prices and federal subsidies, Exxon and other companies invested billions of dollars in speculative oil shale technologies on Colorado's West Slope.  When oil prices dropped and subsidies lagged, Exxon locked the gates of its "Colony" project and fired 2,000 workers on May 2, 1982.  This day – remembered on the West Slope as "Black Sunday" – signaled the dramatic bust of the early 1980s oil shale boom, and caused economic disruption across Colorado.

49.     More than 70% of the oil shale acreage in the Green River Formation – including the richest and thickest oil shale deposits – lies beneath federally owned and managed lands.  As a consequence, the federal government directly controls access to much of the potentially commercially attractive portions of the oil shale resource.

50.     Currently, the millions of acres of federal public lands in Colorado, Utah and Wyoming overlying the Green River Formation provide numerous benefits to residents, visitors, and wildlife.  The area's streams and rivers, which drain to the Colorado River, provide drinking water and agricultural water, and support recreation for millions of people across the West.  These lands are home to some of the nation's healthiest elk herds, rare plants, and more than a dozen species protected as threatened or endangered by the federal Endangered Species Act.

51.     The imperiled sage grouse has numerous breeding grounds (or "leks") within

federal lands overlying the Green River Formation.  Sage grouse are on the verge of requiring

listing under the Endangered Species Act.  Their numbers have declined precipitously

throughout the range of their historic habitat.  A panel of experts convened by the U.S. Fish and

Wildlife Service recently concluded that energy development in the eastern reaches of the sage

grouse's range, including Wyoming and Colorado, represented one of the top threats to sage

grouse survival.  Western Watersheds Project v. United States Fish & Wildlife Service, 535 F.

Supp. 2d 1173, 1180 (D. Id. 2007).  Leks, nesting habitat, and winter concentration areas are all

vital to the continued viability of sage grouse.

52.     These lands also include tens of thousands of acres of lands that qualify as

wilderness; that is, pristine roadless lands unfettered by human development.  Thousands of

hunters, anglers, hikers, bird-watchers and others enjoy these lands every year.

53.     Commercial development of oil shale on federal lands overlying the Green River

Formation would have significant and damaging environmental consequences.  Currently

proposed technologies would require that vast areas be strip-mined so that the kerogen-infused

rocks could be baked off-site, or that similarly vast natural areas be turned into a maze of

industrial facilities that would allow the rock to be baked below ground (a process known as "in

situ retorting").  Because the kerogen-bearing shale must be baked to hundreds of degrees for

long periods, development of oil shale would require massive amounts of electricity.  A RAND

Corporation study found that an oil shale industry producing an equivalent of 1 million barrels of

oil a day would require about 12 gigawatts of dedicated electric generating capacity, more than

likely from coal-fired power plants - the equivalent output of roughly 25 power plants the size of

the current Hayden Generating Station in Routt County, Colorado.  The power plants needed to

develop oil shale would foul the region's air and pump huge amounts of carbon dioxide and

other climate-change-inducing greenhouse gasses into the atmosphere.  Studies also predict that

oil shale development in this arid region could dry up many streams and rivers – including the

Colorado River – for weeks at a time.  BLM estimates that three gallons of water or more may be

needed to produce a single gallon of oil from shale.  Air and water pollution and toxic waste

resulting from the development of an oil shale industry may also threaten human health in nearby

communities.

**B.      Tar Sands Development and Its Potentially Damaging Environmental Impacts**

54.      Another potential source of "unconventionally" produced liquid fuel is tar sands.

Tar sands are a combination of clay, sand, water, and "bitumen," which is a heavy hydrocarbon.

Like kerogen, bitumen from tar sands, once extracted, can be "upgraded" to synthetic crude oil

and then further refined to make gasoline, but only after significant processing using technology

not used in any commercial facility in the United States.

55.      In the early 1980s, the U.S. Geological Survey delineated eleven "special tar

sands areas" (STSAs) covering one million acres in Utah.  Nearly two-thirds of the total acreage

of tar sands deposits within these STSAs are owned or administered by BLM.  The Department

of Energy estimated United States tar sands resources to be equivalent to 60-80 billion barrels of

oil, although less than a quarter of that amount is likely recoverable.

56.      Like oil shale, production of oil from tar sands has proved more fantasy than

reality.  In 1981, Congress established a commercial leasing program for tar sands under the

authority of the Combined Hydrocarbon Leasing Act.  Pub. L. 97-78.  The Act failed to spawn

commercial tar sands development.  Since the law's enactment more than a quarter-century ago,

only six tar sands leases have been sold, and no development has occurred on these leases.

Today, no commercial tar sands industry exists anywhere in the United States.

57.     The eleven STSAs in Utah include important habitat for sage grouse, deer, elk,

and spectacular pristine lands proposed for Congressional wilderness protection.  These

wildlands include portions of Utah's remote San Rafael Swell, lands near the Green River's

Desolation Canyon, and public lands adjacent to the Glen Canyon National Recreation Area,

which is managed by the National Park Service.

58.     Commercial development of tar sands in the STSAs on federal lands, like that for

oil shale, would likely significantly damage the environment.  Tar sands resources can be

recovered using strip mining or underground mining, with subsequent recovery of the bitumen

by a number of different processes, including washing, flotation or retorting.  Bitumen can also

be recovered through in-place processes, involving heating or combusting the tar sands or

injecting material (such as steam, hot water, gas, or solvent) into the sands to release the bitumen

for recovery.  Like oil shale development, tar sands recovery will thus require significant surface

disturbance over large areas, destroying vegetation, disrupting habitat and increasing erosion.

Like oil shale development, tar sands recovery will consume significant amounts of water and

energy, the use and production of which will reduce or eliminate stream and groundwater flows,

foul the air, increase greenhouse gas emissions, and worsen the impacts of global warming.

**C.     The Energy Policy Act of 2005 (EP Act)**

59.     In May 2001, President George W. Bush received recommendations on energy

policy from his National Energy Task Force.  The President used these recommendations,

prepared by the Office of the Vice President, to formulate his national energy policy.  In

response, BLM developed a plan containing 54 tasks designed to implement the President's

directives, including efforts to promote the development of oil shale resources on public lands.

60.     In April 2005, Bush Administration officials and oil company executives testified

before the United States Senate's Committee on Energy and Natural Resources concerning oil

shale.  Administration officials argued that royalty rates should be set to encourage production,

and that "various regulatory issues" discouraged the production of oil shale in the United States.

S. Hrng. 109-35 at 26 (Apr. 12, 2005).  Industry officials agreed.  A representative of Shell Oil

testified that "the time has come for the United States … to encourage, facilitate, and accelerate

the development" of oil shale, and asserted that "the Secretary of the Interior should develop a

commercial oil shale leasing program on an expedited basis."  Id. at 36.  A representative of

Anadarko Petroleum Corporation testified that Congress should help "make commercial oil shale

production a reality within the next decade and provide the momentum needed for private

enterprise to commit to domestic projects of sufficient magnitude to make this happen."  Id. at

69.  He recommended that the federal government "develop[] a federal oil shale leasing

program," and "encourage[d] Congress to direct the Department of the Interior to develop

regulations governing oil shale leasing and development."  Id.

61.     In response, Congress enacted EP Act, which became law on August 8, 2005.

Section 369 of EP Act relates to "Oil Shale, Tar Sands, and Other Strategic Unconventional

Fuels."  See 42 U.S.C. § 15927 (codifying Sec. 369).  The Act recognized the strategic

importance of developing oil shale and tar sands reserves, but also declared it to be Congress's

policy that commercial development of these resources "should be conducted in an

environmentally sound manner, using practices that minimize impacts." 42 U.S.C. § 15927(b).

The Act required that, "in accordance with" NEPA, the Secretary of the Interior prepare a

"programmatic environmental impact statement for a commercial oil shale and tar sands leasing

program on public lands, with an emphasis on the most geologically prospective lands" in

Colorado, Utah and Wyoming.  42 U.S.C. § 15927(d)(1).  The Secretary was given 18 months to

complete the programmatic EIS (PEIS).  Id.

**D.**     **The Programmatic Environmental Impact Statement**

62.     Following EP Act's mandate, BLM announced its intent to prepare a PEIS on oil

shale and tar sands leasing in three states on December 13, 2005.  70 Fed. Reg. 73,791 (Dec. 13,

2005).  BLM stated its analysis would consider how "to amend applicable [RMPs] to open BLM

lands for oil shale and tar sands leasing in Colorado, Utah and Wyoming." Id. at 73,971.  BLM

promised the draft EIS would address "major issues" that included "wildlife and wildlife habitat

quality and fragmentation" and the "protection of wilderness, riparian, and scenic values."  Id.

63.     Two years later, BLM announced the issuance of its draft PEIS.  72 Fed. Reg.

72,751 (Dec. 21, 2007).  BLM provided the public 90 days to comment on the draft PEIS, though

the deadline was later extended.  See 73 Fed. Reg. 51,838, 51,839 (Sep. 5, 2008).

64.     In its draft PEIS, BLM announced that it had changed the scope of the PEIS's

analysis from that mandated by Congress.  While EP Act required that BLM analyze "a

commercial oil shale and tar sands leasing program on public lands, with an emphasis on the

most geologically prospective lands" in Colorado, Utah and Wyoming, 42 U.S.C. § 15927(d)(1),

BLM announced:

The purpose and need for the PEIS now is to:

> (1) Identify the most geologically prospective areas where oil shale and tar
> sands resources are present on public lands and that could be open to
> application for commercial leasing, exploration, and development; and

> (2) Evaluate the environmental effects associated with amendments of 12 land
> use plans to allow for application for commercial oil shale or tar sands leasing.

72 Fed. Reg. 72,752.  BLM stated that it made the change because it lacked "critical information

on which to assess potential impacts, define required mitigation and approve commercial

leasing." Id.

65.     The draft PEIS examined only three alternatives in detail for each resource.  For

oil shale, the draft PEIS examined:

> - Alternative A.  This is the "no action" alternative under which BLM would amend no
>   RMPs, limiting oil shale leasing to approximately 300,000 acres of BLM land in
>   Colorado where such leasing is permitted by existing RMPs.

> - Alternative B.  This is the "preferred alternative," which would amend RMPs to open
>   two million acres of BLM land to oil shale leasing, excluding from leasing only those
>   areas where such leasing is prohibited by law.

> - Alternative C.  This alternative would amend RMPs to open over 800,000 acres of BLM
>   land to oil shale leasing.  It would exclude from leasing lands identified as requiring
>   special management or resource protection in existing land use plans.

Final PEIS at 2-17; 2-26; 2-32.

66.     For tar sands, the draft PEIS examined three similar alternatives:

> - Alternative A.  Under this "no action" alternative, BLM would amend no RMPs, and tar
>   sands would be regulated under the 1981 Combined Hydrocarbon Leasing Act
>   program, which has yielded no proposal for development over the last three decades.
>   BLM assumes no federal land tar sands development from this alternative.

> - Alternative B.  The "preferred alternative" would amend six RMPs to open about
>   430,000 acres of BLM land to commercial tar sands leasing, excluding from leasing
>   only those areas where such leasing is prohibited by law.

- Alternative C.  This alternative would amend six RMPs to open about 230,000 acres of BLM land to commercial tar sands leasing.  It would exclude from leasing lands identified as requiring special management or resource protection in existing land use plans.

Final PEIS at 2-39 – 2-45.

67.     BLM failed to consider an alternative for either oil shale or tar sands that would open lands to oil shale leasing while protecting wilderness quality lands.  Both of the oil shale and tar sands "action alternatives" (Alternatives B and C) would authorize leasing on tens of thousands of acres of such lands.  Both oil shale action alternatives open to leasing portions of areas proposed for wilderness protection by Congress including:  Desolation Canyon, White River, Lower Bitter Creek, and Sunday School Canyon in Utah; and Devil's Playground, Adobe Town, and Kinney Rim in Wyoming.  Both tar sands action alternatives open to leasing wilderness lands in Utah including Desolation Canyon, Dirty Devil, Mexican Mountain, San Rafael Reef, and Sunday School Canyon proposed wilderness areas.

68.     BLM failed to consider an alternative for oil shale that would open lands to leasing while protecting habitat critical to the survival of the sage grouse.

69.     The states of Colorado and Utah identified a total of more than 350,000 acres of sage grouse habitat open for oil shale leasing under Alternatives B and C.  Final PEIS at 6-77; 6-104.  Both tar sands action alternatives open to commercial leasing more than 100,000 acres of state-identified sage grouse habitat.  Final PEIS at 6-227; 6-253.  BLM thus failed to consider an action alternative for either tar sands or oil shale that would protect habitat critical for the sage grouse's survival.

70.     BLM received over 100,000 comments on the proposed action and draft EIS, many of them critical of the agency's failure to properly disclose environmental impacts.  73

Fed. Reg. 51,839.  The Governor of Colorado, the Governor of Wyoming, the City of Rifle, and

thousands of other commentators supported the "no action alternative," and expressed concern

about the proposed action's impact on wildlife.  Final PEIS, Vol. 4 at 678, 5,296, 5,300-5,301,

5,455.  Some Conservation Groups and others specifically requested that BLM consider action

alternatives that protected wilderness quality lands and crucial sage grouse habitat from leasing.

71.     BLM chose not to heed these comments.  On September 5, 2008, BLM published

a notice of availability (NOA) of the final PEIS, and of proposed RMP amendments.  73 Fed.

Reg. 51,838 (Sept. 5, 2008).  BLM stated that it had clarified some of the analysis and

description of the proposed action based on the comments it received on the draft PEIS, but that

the "proposed land use plan alternatives remained unchanged" from the draft PEIS.  73 Fed. Reg.

at 51,839.

72.     In the final PEIS, BLM failed to consider action alternatives that protected

wilderness lands or crucial sage grouse habitat from leasing.

73.     BLM's preferred alternative in the PEIS would amend BLM land use plans across

the three states "to make approximately 2 million acres of lands containing oil shale resources"

and "approximately 430,000 acres" of lands with tar sands "available for application for

commercial leasing."  73 Fed. Reg. at 51,839.

74.     In announcing the availability of the proposed RMP amendments and final PEIS,

BLM stated that the Assistant Secretary of Interior for Land and Minerals Management is the

"responsible official for these proposed plan amendments," and, as such, the NOA "is the final

decision" of DOI.  73 Fed. Reg. at 51,840.  Therefore, "[t]his decision is not subject to

administrative review (protest) under the BLM or Departmental regulations." Id. (emphasis added).

75.    United States Senator Ken Salazar condemned the release of the final PEIS, stating that "the Administration seems bent on tuning out the voices of Coloradans, ignoring the BLM's own conclusions about oil shale, and rushing ahead with a last minute fire sale of commercial oil shale leases at any cost."  Press release, "Sen. Salazar's Statement on Administration's Latest Step Toward Last Minute Oil Shale Leasing" (Sept. 4, 2008).

76.    On October 6, 2008, Conservation Groups and others wrote Defendant Secretary Kempthorne notifying him that his decision to eliminate any administrative protest opportunity for the proposed RMP amendments violated FLMPA and BLM's governing regulations.  Letter from A. Morgan, et al. to Sec'y Kempthorne (Oct. 6, 2008).  Secretary Kempthorne never responded, nor took any action to provide the public with an opportunity to protest the RMP amendments.

77.    On November 17, 2008, Defendant BLM Director Caswell recommended adoption and implementation of the proposed RMP amendments.  Defendant Assistant Secretary Allred approved the amendments as part of the Record of Decision (ROD) that same day.  The ROD amended ten RMPs as proposed in the preferred alternative, making nearly 2 million acres of lands containing oil shale resources and over 430,000 acres of lands with tar sands "available for application for commercial leasing and future exploration and development of these resources."  ROD at iii, 38-39.  Issuance of the ROD constituted final agency action on the RMP amendments.

## FIRST CLAIM FOR RELIEF

<u>Violation of 43 C.F.R. §§ 1610.2, 1610.5, and the Administrative Procedure Act:
Preclusion of Public Administrative Protest</u>

78.     The allegations in paragraphs 1-77 are incorporated herein by reference.

79.     BLM regulations require that the agency provide the public with an opportunity to file a formal administrative protest of an RMP amendment before the agency adopts the amendment.  <u>See</u> 43 C.F.R. §§ 1610.2, 1610.5.

80.     BLM failed to provide the public an opportunity to protest the proposed RMP amendment decision, in violation of its own regulations.

81.     By precluding public administrative protest, BLM's decision violates 43 C.F.R. §§ 1610.2, 1610.5, and so is arbitrary, capricious, or otherwise not in accordance with law.  <u>See</u> 5 U.S.C. § 706(2)(A) (APA).

## SECOND CLAIM FOR RELIEF

<u>Violations of the Federal Land Policy and Management Act:
Preclusion of Public Administrative Protest</u>

82.     The allegations in paragraphs 1-77 are incorporated herein by reference.

83.     Section 102(a)(5) of the Federal Land Policy and Management Act, 43 U.S.C. § 1701(a)(5), "declares that it is the policy of the United States" that in "administering public land statutes and the discretionary authority granted by them" the Secretary "be required … to structure adjudication procedures to <u>assure ... objective administrative review of initial decisions</u> ...."  Emphasis added.

84.     FLPMA § 202(f), 43 U.S.C. § 1712(f), provides that "[t]he Secretary ... by regulation shall establish procedures, including public hearings where appropriate, to give

25

Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands."  See also 43 U.S.C. § 1739(e).

85.     BLM's announcement of its final decision to preclude public administrative protests violates section 102 of FLPMA, which declares that the Secretary "be required … to structure adjudication procedures to assure ... objective administrative review of initial decisions."  43 U.S.C. § 1701(a)(5).  BLM's decision to preclude public administrative protests also violates the requirements of sections 202 and 309 of FLPMA to give the public "adequate" opportunity "to participate in the formulation of plans and programs."  43 U.S.C. §§ 1712(f) & 1739(e).

86.     BLM's decision to preclude a public administrative protest, in violation of FLPMA, is arbitrary, capricious, or otherwise not in accordance with law.  See 5 U.S.C. § 706(2)(A) (APA).

### THIRD CLAIM FOR RELIEF

Violation of the National Environmental Policy Act:
Failure to Consider a Range of Reasonable Alternatives

87.     The allegations in paragraphs 1-77 are incorporated herein by reference.

88.     NEPA requires federal agencies, including BLM, to include within an EIS "alternatives to the proposed action."  42 U.S.C. § 4332(C)(iii).  The alternatives analysis is the "heart" of a NEPA document, and the statute's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).

89.     BLM's failure to consider an action alternative that fully protected wilderness quality lands and/or crucial sage grouse habitat violated NEPA's range of alternatives requirement and regulations implementing NEPA, and so is arbitrary, capricious, or otherwise not in accordance with law.  See 5 U.S.C. § 706(2)(A) (APA).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that BLM violated its regulations at 43 C.F.R. §§ 1610.2 and 1610.5 when it made the final decision denying a public administrative protest;

2.      Declare that BLM violated FLPMA when it made the final decision denying a public administrative protest;

3.      Declare that BLM's adoption of RMP amendments opening areas to oil shale or tar sands commercial leasing violated NEPA as set forth above;

4.      Order BLM to comply with the requirements for 43 C.F.R. §§ 1610.2 and 1610.5 and provide a 30-day public protest period starting from the date of this Court's order;

5.      Issue an injunction setting aside the record of decision approving the RMP amendments opening areas to oil shale leasing;

6.      Enjoin BLM from implementing or relying upon the RMP amendments opening areas to oil shale and tar sands leasing, including the sale or issuance of any oil shale or tar sands leases within the planning area, until such time as BLM has complied with NEPA and FLPMA as set forth above;

7.      Grant such restraining orders and/or preliminary and permanent injunctive relief as Plaintiffs may request;

8.      Award Plaintiffs their reasonable fees, expenses, costs, and disbursements,

including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28

U.S.C. § 2412; and

10.      Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted January 16, 2009.

s/ Edward B. Zukoski
Edward B. Zukoski
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
Tel:  (303) 623-9466
E-mail: tzukoski@earthjustice.org

Attorney for Plaintiffs


Ms. Joro Walker, Esq.
Western Resource Advocates
425 East 100 South
Salt Lake City, UT  84111
Tel: (801) 487-9911
E-mail: jwalker@westernresources.org
*Application for Colorado Federal Bar
Pending*

Attorney for Western Resource Advocates

Melissa G.Thrailkill, Esq.
Center for Biological Diversity
351 California Street, Ste. 600
San Francisco, CA  94104
Tel:  (415) 436-9682, ext. 313
E-mail: mthrailkill@biologicaldiversity.org
*Application for Colorado Federal Bar pending*

Attorney for Biodiversity Conservation
Alliance, Center for Biological Diversity,
Colorado Environmental Coalition, Defenders
of Wildlife, Natural Resources Defense Council,
Red Rock Forests, Sierra Club, Southern Utah
Wilderness Alliance, Western Colorado
Congress, Western Resources Advocates,
The Wilderness Society, and Wilderness
Workshop

# PLAINTIFF ADDRESS LIST

Biodiversity Conservation Alliance
215 South Third Street
Laramie, WY  82070

Center for Biological Diversity
351 California Street, Ste. 600
San Francisco, CA  94104

Colorado Environmental Coalition
1536 Wynkoop St., Suite 5C
Denver, CO  80202

Defenders of Wildlife
1130 17th Street N.W.
Washington, DC  20036

National Wildlife Federation
2260 Baseline Road, Suite 100
Boulder, CO  80302

Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA  94104

Red Rock Forests
1517 Spanish Valley Drive
Moab, UT 84532

Sierra Club
Environmental Law Program
85 Second St., 2nd Floor
San Francisco, CA  94105

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT  84111

Western Colorado Congress
124 North Sixth St.
Grand Junction, CO  81502

Western Resource Advocates
2260 Baseline Road, Suite 200
Boulder, CO  80302

The Wilderness Society
1660 Wynkoop St., Suite 850
Denver, CO  80202

Wilderness Workshop
589 Main Street
Carbondale, CO  81623