**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00085-JLK

COLORADO ENVIRONMENTAL COALITION,
WESTERN COLORADO CONGRESS,
WILDERNESS WORKSHOP,
BIODIVERSITY CONSERVATION ALLIANCE,
SOUTHERN UTAH WILDERNESS ALLIANCE,
RED ROCK FORESTS,
WESTERN RESOURCE ADVOCATES,
NATIONAL WILDLIFE FEDERATION,
CENTER FOR BIOLOGICAL DIVERSITY,
THE WILDERNESS SOCIETY,
NATURAL RESOURCES DEFENSE COUNCIL,
DEFENDERS OF WILDLIFE, and
SIERRA CLUB,

      Plaintiffs,

v.

DIRK KEMPTHORNE, in his official capacity as Secretary of the Department of Interior,
C. STEPHEN ALLRED, in his official capacity as Assistant Secretary for Land and Minerals,
Department of the Interior,
THE U.S. DEPARTMENT OF THE INTERIOR,
JAMES L. CASWELL, in his official capacity as Director of the Bureau of Land Management,
and
THE BUREAU OF LAND MANAGEMENT,

      Defendants,

SHELL FRONTIER OIL & GAS INC.,

      Applicant for Intervention as Defendant.

---

### SHELL FRONTIER OIL & GAS INC.'S MOTION TO INTERVENE AS A DEFENDANT

## <u>INTRODUCTION</u>

Pursuant to Federal Rule of Civil Procedure 24(c), Applicant for Intervention, Shell Frontier Oil & Gas Inc. ("Shell"), moves this Court for an Order granting Shell leave to intervene as a Defendant in this action brought by Colorado Environmental Coalition, Western Colorado Congress, Wilderness Workshop, Biodiversity Conservation Alliance, Southern Utah Wilderness Alliance, Red Rock Forests, Western Resource Advocates, National Wildlife Federation, Center for Biological Diversity, The Wilderness Society, Natural Resources Defense Council, Defenders of Wildlife, and Sierra Club (collectively "CEC").  CEC challenges the November 2008 Record of Decision issued by the Bureau of Land Management ("BLM") amending land resources management plans for BLM jurisdictions in Colorado, Utah, and Wyoming to make lands available for commercial oil shale and tar sands leasing (the "RMP Amendments").  CEC seeks an Order to set aside the RMP Amendments and to enjoin BLM from relying on the RMP Amendments to open lands to oil shale and tar sands leasing, including the sale or issuance of any such lease.

Shell submitted public comments on the proposed RMP Amendments.  It also holds oil shale RD&D leases, which are located within the areas subject to the RMP Amendments.  As explained below, these circumstances warrant Shell's intervention as of right under Rule 24(a), or alternatively, its intervention by permission under Rule 24(b).

In accordance with Local Rule 7.1(A), undersigned counsel for Shell has conferred with counsel for CEC and Federal Defendants with respect to Shell's intervention in this action.  CEC may oppose Shell's intervention, and it intends to file a responsive memorandum within the time provided by the local rules.  The Federal Defendants take no position.

## FACTUAL BACKGROUND

A.      **Nature and Location of Oil Shale Resources**

Oil shale is a fine-grained sedimentary rock containing organic matter (kerogen) from which shale oil may be produced.  73 Fed. Reg. 69414 (Nov. 18, 2008).  The world's largest known oil shale deposits exist in a 16,000 square mile area in the Green River formation in Colorado, Utah and Wyoming (underlying the Piceance, Uinta, Green River, and Washakie Basins).  *Id.*  One study estimates the area to contain the equivalent of between 1.5 and 1.8 trillion barrels of oil.  *Id.*  Federal lands comprise 72 percent of the surface of oil shale acreage and 82 percent of the oil shale resources in the Green River formation.  *Id.*

B.      **Energy Policy Act of 2005**

In August of 2005, Congress enacted the Energy Policy Act of 2005 ("EP Act"), 42 U.S.C. § 15927.  Section 369 of the EP Act declares that oil shale and tar sands deposits are "strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports" and mandates that development of oil shale "should occur, with an emphasis on sustainability" to benefit the United States.  *Id.* at § 15927(b).  To support this policy, the EP Act directs the Secretary of the Interior ("Secretary") to implement a series of actions to establish a commercial leasing program for oil shale and tar sands.  These actions include:  (1) make public lands available for conducting oil shale research and development activities; (2) complete a Programmatic Environmental Impact Statement ("PEIS") for a commercial leasing program for both oil shale and tar sands resources on BLM-administered lands in Colorado, Utah and

Wyoming; and (3) issue regulations establishing a commercial oil shale leasing program.  *Id.* at § 15927(c)-(d).

**C.**     **BLM Implementation of Energy Policy Act**

    **Research, Development and Demonstration Leasing Program.**  As directed by the EP Act, 42 U.S.C. § 15927(c), BLM has made public lands available for Research, Development and Demonstration ("RD&D") leasing to conduct oil shale research and development.  On June 9, 2005, BLM initiated the RD&D leasing program by soliciting nominations of 160-acre parcels of public land to be leased in Colorado, Utah and Wyoming for conducting oil shale recovery technologies.  *See* 73 Fed. Reg. at 69415.  In response to 19 nominations of parcels, BLM issued six RD&D leases, *id.*, as described in more detail below. *See infra* at 8-9.

    **The Programmatic Environmental Impact Statement.**  The RMP Amendments challenged in this action pursuant to the second action directed by the EP Act.  Specifically, EP Act requires the Secretary to "complete a [PEIS] for a commercial leasing program for oil shale and tar sands resources on public lands, with an emphasis on the most geologically prospective lands within each of the States of Colorado, Utah, and Wyoming." 42 U.S.C. § 15927(d)(1).  To fulfill this mandate, BLM prepared a draft PEIS analyzing the BLM's proposal to amend 12 RMPs in Colorado, Utah, and Wyoming to describe the most "geologically prospective" lands for oil shale and tar resources, and to designate portions of those lands as available for application for commercial leasing and future exploration and development.  *Id.*  The PEIS analyzes three alternatives and the impacts of this potential land use.[1]  *Id.*

_____

[1]  Although the Administrative Record ("AR") will include the PEIS, the document is also publicly available on BLM's web site at http://ostseis.anl.gov.

The PEIS describes the geology of the oil shale resource area, the history of oil shale development in the western United States (including Shell's early involvement), and the technologies that have been applied to oil shale development (including Shell's advancements in oil shale technology). *See* PEIS, Appendix A "Oil Shale Development Background and Technology Overview." The PEIS anticipates that the development of oil shale resources will "be led by the activities on the six [RD&D leases]." *Id.* at A-3. The PEIS also discusses in detail Shell's Mahogany Research Project being conducted on Shell-owned property in Rio Blanco County, Colorado, which BLM characterizes as a "project of particular potential importance." *Id.* at A-52. The PEIS also specifically describes the projects to be conducted on Shell's RD&D leases and notes several environmental considerations, such as groundwater and surface water management, storage and disposal of materials and waste, water requirements, noise, and air emissions. *Id.* at A-66 – A-74.

On November 17, 2008, BLM issued a Record of Decision ("ROD") approving the RMP Amendments and PEIS analysis. *See* ROD at ii, 38-39, 56.[2] Pursuant to the ROD, several land use plans are amended to designate 1,991,222 acres as available for application for commercial oil shale leasing. *Id.* at 13.

**Oil Shale Regulations.** The third action under the EP Act directed BLM to promulgate a final regulation establishing a commercial oil shale leasing program. 42 U.S.C. § 15927(d)(2). Pursuant to this directive, on November 18, 2008, BLM published the final rule establishing regulations for a commercial oil shale leasing program (the "Oil Shale Regulations"). *See* 73

---

[2] The AR also will include the ROD, which is publicly available on BLM's web site at http://www.blm.gov/wo/st/en/prog/energy/oilshale_2.html.

Fed. Reg. 69414 (Nov. 18, 2008) (to be codified at 43 C.F.R. subtitle B Chapter II parts 3900,

3910, 3920 and 3930).  The Oil Shale Regulations establish a procedural framework for

administering an oil shale program, which governs the general manner in which industry and

BLM will operate.  *Id.*

D.     **Shell's Interests in the Subject of this Litigation**

Shell's extensive interests in the subject of this litigation are evidenced by its

development of oil shale technology over many decades, its participation in the PEIS analysis of

the RMP Amendments, its participation in the Oil Shale Regulations rulemaking, and the oil

shale leases from BLM that Shell currently holds.  Several entities within the Shell group of

companies have been involved in these efforts, including Shell Exploration and Production

Company, and these related entities are included in the descriptions of Shell's activities.

**Shell's Efforts to Develop Oil Shale Technology.**  Shell has invested considerable time

and effort over more than almost four decades on the challenge of developing oil shale, and

today has more than 100 scientists, engineers and other employees and contractors working on

the task.  *See* Declaration of Thomas D. Fowler ("Fowler Decl.") (Exhibit A hereto) at ¶ 4.

Since its first pilot in the early 1970s, Shell's research efforts have resulted in many

technological advancements.  It holds approximately 115 patents for oil-shale related

technologies, and has approximately 90 patent applications pending.  *Id.* at ¶ 13.  Shell's

extensive research program may progress further through its initial work on public lands once

pilot tests commence on its RD&D leases.  *See id.*  When these pilot tests are completed, Shell

may be situated to evaluate moving ahead with a commercial-scale facility.  By then, Shell likely

will have invested nearly a half century of research and development – all before any profit-making production will occur.

The Shell group of companies has worked for several decades to test its technology to unlock oil shale.  Shell started conducting pilot projects in the early 1970s in the Piceance Basin in Colorado.  *Id.* at ¶ 5.  Continuing its efforts in the 1980s, Shell conducted a new experimental in-situ (in ground) heating process test on Shell-owned property in Colorado.  *Id.* at ¶ 6.  Despite the general industry-wide end of oil shale activities during that time period, Shell continued work in company laboratories, eventually developing the In-Situ Conversion Process.  *Id.*  Into the 21st century, Shell continued to conduct field demonstrations of its oil shale technologies.  Shell conducted separate In-Situ Conversion demonstration projects from 1996-1998, 2000, and again beginning in 2003.  *Id.* at ¶¶ 7-9.  In 2002-2004, Shell added the approach of using a freeze wall (essentially a subsurface barrier of ice blocking groundwater flow) to aid in oil shale recovery.  *Id.* at ¶ 10-11.  Shell is currently conducting a field test investigating the viability of using freeze wall containment for a commercial oil shale project.  *Id.* at ¶ 12.

**Shell's Participation in BLM's Development of an Oil Shale Leasing Program.**  Shell has participated in the actions undertaken by BLM to implement the EP Act's directive to establish a commercial oil shale leasing program.  On March 28, 2008, Shell submitted to BLM comments regarding the draft PEIS.  *See* Declaration of Richard S. Mykitta ("Mykitta Decl.") (Exhibit B hereto) at ¶ 10 & attachment 3 (Shell comments on draft PEIS).  Also, on October 25, 2006, in response to an Advance Notice of Proposed Rulemaking, Shell submitted to BLM detailed comments regarding the key regulatory components of the Oil Shale Regulations.  *Id.* at ¶ 10.

**Shell's Oil Shale RD&D Leases.**  In accordance with the BLM oil shale RD&D leasing program, announced in the Federal Register on June 9, 2005, Shell applied for leases of three separate parcels of land in Rio Blanco County, Colorado to test various aspects of its patented In-Situ Conversion Process for extracting oil shale.  *Id*. at ¶ 3.  Shell submitted Plans of Operation for each pilot in February 2006.  *Id.*  Through a competitive process, BLM determined that Shell's proposed technology pilot tests merited encouragement in the form of RD&D leases.  *Id.*  Shell received three of six leases that BLM awarded.  *See* 73 Fed. Reg. at 69415.  Shell's three leases became effective January 1, 2007.  Mykitta Decl. ¶ 3.  Shell submitted revised Plans of Operations for these leases, which BLM approved.  *Id.* ¶ 8.

Each Shell RD&D lease site encompasses approximately a 160-acre tract associated with a potential preference right lease of up to approximately 4,960 additional acres.  *Id.* ¶ 4.  The lease sites exist in an area categorized as suitable for both RD&D and commercial leasing (once commercial leasing regulations were in place) in the 1997 White River Resource Management Plan.  *Id.* at ¶ 6.  The lease sites remain on land categorized for oil shale commercial leasing in the 2008 RMP amendments.  *See id.*; ROD at 13-14 (Figure 5).  The lease agreements grant Shell "the exclusive right and privilege to prospect for, drill, mine, extract, remove, beneficiate, concentrate, process and dispose of the oil shale and the products of oil shale contained within the Leased Lands as proposed in the nomination submitted in response to the Federal register notice of June 9, 2005."  *See* Mykitta Decl. ¶ 3 & attachment 1 (RD&D lease).  The lease agreements are for a term of 10 years, and the parties have the option to extend the lease term for up to five more years upon demonstrating diligent pursuit of a process leading to the production of commercial quantities of oil shale.  *Id*., Section 4.  Following additional BLM review and

Shell's successful demonstration of environmentally sound, commercially viable and socially sustainable oil shale recovery, Shell will have the right to obtain a preference right lease for each of its current RD&D leases. *Id.*, Section 23.

As Shell moves forward with its pilot tests over the remainder of its RD&D lease term, aspects of its activities would be governed by the Oil Shale Regulations. The regulations address, for example, the forms of reclamation bonds that are permissible, the circumstances under which a suspension may be required or granted, and inspection/enforcement procedures. Further, Shell's current activities are a prelude to potential future commercial oil shale development. To make informed investment decisions, Shell must be able to predict the likely costs of future development. *See* Mykitta Decl. ¶ 11. This includes royalties, bonds, reclamation requirements, lease duration, diligent development requirements, and other aspects of a commercial operation. *Id.* Given the substantial investments necessary for oil shale pilot projects, research, and commercial facilities, regulatory uncertainty can have a significant impact on Shell's interests. *Id.*

### PROCEDURAL BACKGROUND

On January 16, 2009, CEC filed its Complaint, alleging that BLM failed to comply with the Administrative Procedure Ac, 5 U.S.C. § 706(2)(A), and BLM regulations, 43 C.F.R. §§ 1610.2 and 1610.5, by allegedly failing to provide the public an opportunity to protest the proposed RMP Amendments. *See* Compl. ¶¶ 78-81. CEC also alleges that BLM violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701(a)(5), 1712(f), and 1739(e), by failing to provide the public adequate notice and opportunity to comment on and protest the RMP Amendments. *See* Compl. ¶¶ 82-86. Lastly, CEC claims that BLM failed to

comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C)(iii), and NEPA implementing regulations, 40 C.F.R. § 1502.14, allegedly failing to consider an action alternative that fully protected wilderness lands and sage grouse habitat.  *See* Compl. ¶¶ 87-89.

CEC urges the Court to declare that the RMP Amendments violate BLM regulations, FLPMA, and NEPA, and to order BLM to provide a 30-day public comment period.  *Id.* at Prayer for Relief ¶¶ 1-4.  CEC also seeks injunctive relief setting aside the RMP Amendments and enjoining BLM from implementing or relying upon the RMP Amendments to open any areas to oil shale and tar leasing, including the sale or issuance of such leases.  *Id.* at ¶¶ 5-6.

In related litigation filed the same day as this action, CEC challenges the Oil Shale Regulations.  *See Colo. Envtl. Coal. v. Kempthorne*, Case No. 09-cv-00091-JLK (filed Jan. 16, 2009).  Shell is moving to intervene in that case as well to protect its interests similar to those at stake in this litigation.

## STATEMENT OF APPLICABLE LAW

Shell moves to intervene in this action as of right under Fed. R. Civ. P. 24(a)(2).  A court should grant a Rule 24(a)(2) motion if:  (1) the application is "timely"; (2) "the applicant claims an interest relating to the property or transaction which is the subject of the action"; (3) the applicant's interest "may as a practical matter" be "impair[ed] or impede[d]"; and (4) "the applicant's interest is [not] adequately represented by existing parties."  *Id.*; *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) (quoting *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001)).  The Tenth Circuit "follows a somewhat liberal line in allowing intervention."  *Utah Ass'n of Counties*, 255 F.3d at 1249.

## ARGUMENT

I.   **SHELL MAY INTERVENE IN THIS ACTION AS OF RIGHT**

Shell satisfies Rule 24(a)(2)'s requirements for intervention as of right.

### A.   **Shell's Motion For Intervention Is Timely**

A trial court determines the timeliness of a motion to intervene " 'in light of all of the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances.' " *Id.* at 1250 (quoting *Sanguine, Ltd. v. U.S. Dep't of the Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984) ("*Sanguine*")).  Federal courts should avoid absolute measures of timeliness and grant intervention where no party "would be hurt and greater justice could be obtained." *Id.* (citation and quotation omitted).

Shell meets Rule 24's timeliness requirement.  This action is at its earliest stages.  CEC filed its Complaint on January 16, 2009.  The Federal Defendants have not yet answered or filed the administrative record, and the Court has not issued a case management order.  Shell's participation will not delay the proceedings or require the Court to alter the schedule for any discovery or motions.  Therefore, intervention will not prejudice the other parties. *See Utah Ass'n of Counties*, 255 F.3d at 1251 (deeming timely a motion to intervene filed two-and-a-half years after lawsuit was initiated, where the court had not set a trial date or cut-off date for motions, and all that had occurred was document discovery, discovery disputes, and motions seeking dismissal on jurisdictional grounds).  Thus, Shell's motion to intervene is timely.

**B.**     <u>Shell Has Legally Protectable Interests</u>

The Tenth Circuit recently addressed Rule 24(a)(2)'s second and third requirements (interest and impairment of interest) in *San Juan County, Utah v. United States*, 503 F.3d 1163 (10th Cir. 2007) (en banc).  Instead of analyzing the requirements discretely, the court addressed what it called the "impaired-interest requirement"–"namely, that 'the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest.' "  *Id.* (quoting Fed. R. Civ. P. 24(a)).

After a lengthy analysis, the court rejected the rigid formulation in prior precedent that an intervenor's interest "be direct, substantial, and legally protectable."  *Id.* at 1192-93.  Rather, the court emphasized "the practical effect on the prospective intervenor" and that Rule 24(a)(2)'s "factors are not rigid, technical requirements."  *Id.* at 1195.  For example, the court added, "a lesser showing of impairment may be required by the court if the applicant's interest is very strong.  Likewise, intervention of right may be granted if the applicant's claimed interest may be significantly impaired by the action, even if some uncertainty exists regarding the sufficiency of that interest."  *Id.*  Also, the inquiry is case and fact specific.  *Id.*  The court summed up its analysis, stating:  "The applicant must have an interest that could be adversely affected by the litigation.  But practical judgment must be applied in determining whether the strength of the interest and the potential risk of injury to that interest justify intervention."  *Id.* at 1199; *see also Utah Ass'n of Counties*, 255 F.3d at 1252 (noting that courts do not measure an intervenor's interest by the particular issue before the court, but by whether the interest relates to the subject of the action).

In *San Juan County*, San Juan County sued the federal government to quiet title in a right-of-way along part of a creek running through a national park. *Id.* at 1167. Several conservation groups moved to intervene based on their concerns about the potential environmental damage from allowing vehicular traffic on the road. *Id.* at 1168. A majority of the en banc court deemed the groups' environmental concerns "a legally protectable interest." *Id.* at 1199. The court dismissed the view that the groups could not intervene because their interests ultimately may not be injured even if the defendants prevailed. *Id.* at 1200. It was enough that the County and State might pursue opening the right-of-way to vehicular traffic if title was quieted in their favor because what matters for intervention is the "*practical effect* of a judgment . . . not the *legally compelled* effect." *Id.* (emphasis in original).

Here, Shell has "an interest relating to the property or action and [Shell] is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest." *Id.* at 1201. Shell already holds RD&D leases, which are located on parcels that the RMP Amendments (as well as the preceding 1997 RMP) designate as available under the commercial leasing program. *See supra* at 8. Although Shell's current focus is on the RD&D leases, the RMP Amendments make public lands available for the commercial leasing scheme established by the Oil Shale Regulations. While taking the time needed to make sure it develops oil shale in a commercially viable and socially responsible way, Shell ultimately has an interest in a fully developed regulatory and land management program for oil shale leasing. A mature program would include opportunities for competitive lease sales as well as the RD&D leasing mechanism.

Shell also has an economic interest in seeing a return on the substantial resources it has expended to develop its In-Situ Conversion Process technology and in obtaining the federal preference right leases enabling it to commercially apply its technologies. *Id.* at 6-7, 9. Shell has invested substantial sums and nearly four decades of labor to develop and demonstrate a commercially viable oil shale technology.

These interests satisfy the interest and impairments of interest requirements. First, "[t]he threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest." *Utahns for Better Transp.*, 295 F.3d at 1115. In *Utahns for Better Transportation*, an environmental group sued the federal Department of Transportation alleging that a regional transportation plan violated the Clean Air Act. 295 F.3d at 1112. The court held that a trade association, whose members depended on the transportation system for commuting and recreation, delivering materials and equipment, and conducting their business, had the requisite intervention interest. *Id.* at 1116. The court further had "no hesitation in concluding" that the environmental group's action, seeking an order vacating the approval of the transportation plan and prohibiting funding or approval of any capacity-expanding highway projects, may as a practical matter impair or impede the trade association's ability to protect its members' interests. *Id.*

Similarly, in *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1346 (10th Cir. 1978), the court allowed potential recipients of licenses for the operation of uranium mills in New Mexico to intervene in an action brought by environmental groups against federal agencies to prohibit the agencies from issuing licenses without first preparing environmental impact statements. The court recognized that the

litigation's outcome could have profound economic effect on the intervenors, which gave them

the requisite Rule 24(a)(2) interest.  *Id.*; *see also Sanguine*, 736 F.2d at 1420 (granting

intervention as of right to tribal members who owned oil and gas-producing restricted Indian

lands in a lawsuit challenging restrictions on communitization agreements); *Kleissler v. United*

*States Forest Service*, 157 F.3d 964, 973 (3d Cir. 1998) (logging companies and trade association

had sufficient interests to intervene in an action to enjoin logging in a National Forest pending

completion of NEPA process, although they had not received contracts under the specific

projects challenged, since they depended on contracts to cut timber in the Forest and had

business interests in ensuring that the landscape corridor approach to forest management

remained in place); *Conservation Law Foundation of New England, Inc. v. Mosbacher*, 966 F.2d

39, 43-44 (1st Cir. 1992) (finding commercial fishing groups had sufficient interest to intervene

as of right where plaintiff and government agency agreed on a consent decree that set timetables

for establishing a government plan aimed at reducing over-fishing, which regulations would

impair their fishing business).

Second, Shell has demonstrated its interests through participating in the PEIS and RMP

Amendments rulemaking.  *See e.g.*, *Coalition of Ariz./N.M. Counties for Stable Economic*

*Growth v. Dep't of the Interior*, 100 F.3d 837, 840-42 (10th Cir. 1996) (noting proposed

intervenors' participation in underlying administrative rulemaking proceedings supported

intervention); *Mausolf v. Babbitt*, 85 F.3d 1295, 1302 (8th Cir. 1996) (same).  The PEIS presents

an extensive study of the potential effects of oil shale activities as presently known, and will

presumably form the basis for BLM environmental analyses going forward.

Third, the *stare decisis* or comity effects of the legal and factual determinations made in this litigation could constrain Shell's ability to challenge an adverse decision in subsequent proceedings.  *See Utah Ass'n of Counties*, 255 F.3d at 1254) (holding that "the *stare decisis* effect of the district court's judgment is sufficient impairment for intervention under Rule 24(a)(2)") (citing *Coalition of Ariz./N.M. Counties*, 100 F.3d at 844).

Lastly, the Tenth Circuit recently reiterated in *San Juan County* that intervention requirements are more relaxed in cases that raise an issue of public interest, as opposed to cases that implicate solely private rights.  503 F.3d at 1201 (citing *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967)).  This case involves significant public issues of national energy independence and security, the management of public lands, and compliance with environmental statutes.

In sum, Shell has a legally protectable interest related to the subject matter of this action that as a practical matter may be adversely affected by this litigation.

**C.**  **The Existing Parties Do Not Adequately Represent Shell's Interests**

The burden of showing the final criterion, inadequate representation by the present parties, is minimal.  It suffices to show that representation *may be* inadequate.  *Utah Ass'n of Counties*, 255 F.3d at 1254 (citing *Sanguine*, 736 F.2d at 1419).  "[T]he *possibility* of divergence of interest need not be great in order to satisfy the [applicant's] burden." *Id.* (emphasis added); *see also Utahns for Better Transp.*, 295 F.3d at 1117.  A proposed intervenor easily makes this showing when it must rely on the government, who must represent the public interest generally, and who may not view the public interest as coextensive with the intervenor's specific interest. *Utahns for Better Transp.*, 295 F.3d at 1117; *Utah Ass'n of Counties*, 255 F.3d at 1254-55.

Absent intervention, Shell would have to rely on BLM to represent Shell's interests. Because the Federal Defendants have not answered, it is not clear what position BLM and the Department of Interior will take on the particular issues raised by CEC. Although Shell and the Government would presumably seek to defend the RMP Amendments, Shell's interests and BLM's interests almost certainly diverge. Shell has private objectives to protect its investments in oil shale technology. By contrast, BLM's focus will be on protecting the broader national interests, such as furthering the nation's energy policy and managing public lands for multiple use. Thus, denying Shell intervention leaves BLM with the prospective task of protecting not only the public's interest but also the private interest of Shell. *See Utahns for Better Transp.*, 295 F.3d at 1117. This task is "on its face impossible and creates the kind of conflict that satisfies the minimal burden of showing inadequacy of representation." *Id.* (citation and internal quotation omitted).

In *Utahns for Better Transportation*, the Tenth Circuit held that the trade association was not adequately represented by federal transportation agency, although both supported the challenged transportation plan, because of the government's broader interests. 295 F.3d at 1117. *See also Utah Ass'n of Counties*, 255 F.3d at 1254-56 (holding that interests of environmental groups and tourism-related businesses seeking to defend creation of a national monument were not adequately represented by the government in counties' action to invalidate Presidential proclamation establishing the monument).

Moreover, Shell is best postured to make arguments and present evidence that the Federal Defendants may be lacking. *See Utahns for Better Transp.*, 295 F.3d at 1117 (sufficient showing is made when the proposed intervenor has expertise the government agencies may not have)

(citing *Utah Ass'n of Counties*, 255 F.3d at 1255)).  If Shell does not participate in this action, the Court will lack Shell's input on specialized and highly technical matters regarding oil shale development.  Shell may contribute to the informed resolution of the questions raised in this action that directly implicate Shell's substantial interests.  *See Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977).

Finally, if the principal parties settle the case without Shell's participation, Shell would have no means to challenge or address the settlement terms and requirements reached, even though any such agreement might adversely impact Shell.  *See Sanguine*, 736 F.2d at 1419; *see also Mille Lacs Band of Chippewa Indians v. Minn.*, 989 F.2d 994, 1001 (8th Cir. 1993) (noting that if the case was settled rather than litigated, divergence in views between the defendants and applicants for intervention may increase).  For these reasons, the existing parties may not adequately represent Shell's interests.

In sum, Shell satisfies all of Rule 24(a)(2)'s requirements and is entitled to intervene as of right.

## II.      **SHELL SHOULD BE ALLOWED TO INTERVENE BY PERMISSION**

Shell alternatively requests permission to intervene under Fed. R. Civ. P. 24(b)(2).  A court may grant permissive intervention when:  (1) the motion is timely; (2) the applicant's claim or defense and the main action have a question of law or fact in common; and (3) intervention will not delay or prejudice the adjudication of the rights of the original parties.  *City of Stillwell, Okla. v. Ozarks Rural Elec. Coop. Corp.*, 79 F.3d 1038, 1043 (10th Cir. 1996); *Utah ex rel. Utah State Dept. of Health v. Kennecott Corp.*, 232 F.R.D. 392, 398 (D. Utah 2005) ("*Kennecott Corp.*").

**A.      Shell's Intervention Is Timely And Will Not Prejudice The Existing Parties**

As with intervention of right, courts determine timeliness for permissive intervention

from all of the circumstances.  *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427

(10th Cir. 1990).  As described above, given the early stage of this litigation and Shell's

commitment to comply with the Court's scheduling orders, Shell's participation should not

prejudice the original parties.

**B.      Shell's Defenses Share Common Facts And Law With the Main Action**

Unlike intervention of right, Rule 24(b) "dispenses with any requirement that the

intervenor shall have a direct personal or pecuniary interest in the subject of the litigation."  *San

Juan County*, 420 F.3d at 1206 n.4 (citing *Sec. & Exch. Comm'n v. U.S. Realty & Improvement

Co.*, 310 U.S. 434, 459 (1940)).  Rather, courts consider whether intervention will likely

contribute to developing the factual issues and to reaching a just and equitable adjudication of

the legal issues presented.  *Kennecott Corp.*, 232 F.R.D. at 398; *see also Natural Res. Def.

Council, Inc. v. Tennessee Valley Auth.*, 340 F. Supp. 400, 408-09 (S.D.N.Y. 1971) (granting

permissive intervention in action alleging failure to comply with NEPA where applicant for

intervention had a "long-standing interest in and familiarity with strip-mining [the activity

alleged to violate NEPA], expertise that may be helpful in clarifying the facts and issues in this

case"), *rev'd. on other grounds*, 459 F.2d 255 (2d Cir. 1972).

Here, all of Shell's claimed interests and defenses arise from CEC's APA, FLPMA and

NEPA claims and factually intertwine with those actions.  To protect its interests, Shell will raise

defenses to the allegations that BLM violated those statutes.  Moreover, Shell can add its

knowledge and expertise to help develop and clarify the factual and legal issues that CEC raises

concerning the environmental impact of oil shale leasing and operations.  As noted previously,

Shell holds three of only six oil shale RD&D leases.  *See supra* at 4, 8-9.  Shell also participated

in the challenged rulemaking by providing BLM comments and suggestions on numerous issues

raised in the draft PEIS.  *See id.* at 7.  Shell has demonstrated its leadership in oil shale

development and exploration.  It has invested decades of time and effort in creating and testing

its oil shale technology and holds numerous patents in oil shale technology.  *See id.* at 6-7.

In sum, Shell's participation will not prejudice any party and will advance the

development of factual and legal issues to reach a just and equitable adjudication.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant Shell's motion to intervene as of

right under Rule 24(a)(2), or alternatively, permit Shell to intervene under Rule 24(b)(2).

Dated this 12th day of February, 2009

Respectfully submitted,

s/<u>Craig D. Galli</u>
Craig D. Galli (#38499)
HOLLAND & HART LLP
60 East South Temple
Suite 2000
Salt Lake City, UT  84111
Telephone:  (801) 779-5842
E-mail:  cgalli@hollandhart.com

**Attorneys For Applicant for Intervention as a
Defendant Shell Frontier Oil & Gas Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 2/12/2009, I have caused to be electronically filed the foregoing with the Clerk of Court using CM/ECF system which will send notification of such filing to the following e-mail addresses:

tzukoski@earthjustice.org

and I hereby certify that I have caused to be mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participants name:

Lori Carmanian
U. S. DEPARTMENT OF JUSTICE
ENRD/NRS
1961 Stout Street, 8th Floor
Denver, CO  80294

s/Craig D. Galli_____
Craig D. Galli (#38499)
HOLLAND & HART LLP
60 East South Temple
Suite 2000
Salt Lake City, UT  84111
Telephone:  (801) 779-5842
E-mail:  cgalli@hollandhart.com

4445645_3.DOC